# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
　　　　　　　　　　　　　　　　　　　　　　)
**CITY OF MARLBOROUGH,**　　　　　)
**MASSACHUSETTS,**　　　　　　　　 )
　　　　　　　　　　　　　　　　　　　　　　)
　　　　**Plaintiff,**　　　　　　　　　)　　　**Civil No.**
　　　　　　　　　　　　　　　　　　　　　　)　　　**13-12869-FDS**
　　　　**v.**　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　)
**WECARE ENVIRONMENTAL, LLC,**　　)
　　　　　　　　　　　　　　　　　　　　　　)
　　　　**Defendant.**　　　　　　　　　)
_____)

## MEMORANDUM AND ORDER ON
## MOTION FOR PARTIAL SUMMARY JUDGMENT

**SAYLOR, J.**

This action involves allegations that WeCare Environmental, LLC, which operates a

municipal solid waste facility in Marlborough, Massachusetts, caused or allowed its facility to

emit unpleasant odors and failed to manage harmful effluent emanating from the facility.  The

City of Marlborough, which has a contract with WeCare, has brought claims under state

environmental laws and for nuisance, breach of contract, negligence, and trespass.  WeCare has

counterclaimed for breach of contract, indemnification, and breach of the implied covenant of

good faith and fair dealing.

WeCare has moved for partial summary judgment as to three issues relating to its breach-

of-contract claim.  Specifically, WeCare seeks an order interpreting the contract between the

parties as requiring the City (1) to remit certain monthly payments to WeCare, (2) to refrain from

charging WeCare for sewer use, and (3) to permit immediate, round-the-clock access to the

WeCare facility.  The City denies that it owes the specific amounts claimed by WeCare and

contends that it is authorized to charge for sewer use and that it need not permit access to the

facility outside of certain hours that are defined in the agreement.

For the reasons set forth below, the motion will be granted in part and denied in part.

## I. Background

### A. Factual Background

Unless otherwise noted, the following facts are undisputed for the purposes of this motion.

#### 1. The 1998 Agreement and the Solid Waste Facility

In 1998, the City of Marlborough entered into an agreement (the "1998 Agreement") with a company known as Bedminster Marlborough LLC in which Bedminster agreed to provide the City with services related to recycling and solid waste disposal. (McCarthy Aff. ¶ 3; City Resp. to WeCare SMF ¶ 1).[1] On February 25, 2003, Bedminster assigned the contract to WeCare. (McCarthy Aff. ¶ 3; City Resp. to WeCare SMF ¶ 2; Assignment and Amendment Agreement at 1).

The 1998 Agreement contemplated the construction and operation of a solid waste disposal facility adjacent to the City's Easterly Wastewater Treatment Facility. (*See* 1998 Agreement at 1, 7). WeCare now operates such a facility at that location, pursuant to the terms

---

[1] The City contends that WeCare's motion should be denied on the ground that it failed to comply with the requirement of Local Rule 56.1 that "[m]otions for summary judgment shall include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation." WeCare's memorandum in support of the motion for partial summary judgment includes a section entitled "Undisputed Facts," but it does not include specific page references for at least some of the facts asserted. The City also contends that the motion should be denied due to WeCare's alleged failure to confer with the City pursuant to Local Rule 7.1.

The Court expects counsel to follow the rules. However, it will, in the exercise of its discretion and under the present circumstances, consider the motion on the merits. *See Converse, Inc. v. Reebok Int'l, Ltd..*, 328 F.Supp.2d 166, 174 n. 7 (D. Mass. 2004) ("[A]lthough a litigant's failure to observe the Local Rules invites sanctions, omitting to confer prior to filing a motion certain to be opposed does not warrant so severe a sanction as summary denial.") (citing *Gerakaris v. Champagne*, 913 F.Supp. 646, 651 (D. Mass.1996)).

of the 1998 Agreement. (McCarthy Aff. ¶ 1). According to the complaint, the facility consists

of eight structures, including a "biosolids receiving building," a "compost aeration building,"

and a "biofilter building." (Compl. at 1). As a result of its operations, the facility discharges a

certain quantity of liquid effluent, or leachate, directly into the Easterly Wastewater Treatment

Plant. (Compl. ¶ 9; *see* 1998 Agreement § 5.07(b)).

## 2. The Provisions of the 1998 Agreement

Section 1.01 of the 1998 Agreement defines a number of relevant terms.

The term "Delivery Hours" is defined as "the hours during which waste and sludge shall

be accepted at the Facility." (1998 Agreement at 3). The term "Normal Delivery Hours" is

defined as "the hours between 8:00 a.m. and 5:00 p.m., Monday through Friday, and between

8:00 a.m. and 3:00 p.m., Saturday, excluding, however, New Year's Day, Thanksgiving,

Christmas, Memorial Day, Labor Day, Veterans Day and July 4." (1998 Agreement at 3-4). In

the 2003 assignment agreement, the weekday hour reference in the definition of "Normal

Delivery Hours" was changed to "the hours between 7:00 a.m. and 6:00 p.m., Monday through

Friday." (Assignment ¶ 4(a)).

The term "Facility" is defined in Section 1.01 as

the solid waste co-composting plant and ancillary facilities, including without
limitation the recycling and rubbish drop-off center, together with roadways,
equipment and other improvements to be constructed and maintained by [WeCare]
on the Site as contemplated by this Agreement, all equipment and vehicles used in
connection therewith (excluding haul vehicles necessary for the removal of Residue
from the Site), as described in more detail in Schedules 1 and 2 hereto, and all
modifications thereof, replacements and additions thereto.

The term "Site" is defined in Section 1.01 as

that parcel of real property located in the Municipality adjacent to the Municipality's
Easterly Wastewater Treatment Facility on which the Facility is to be constructed,

3

as more particularly described in Schedule 2, together with licenses and rights of way for purposes of ingress, egress and utility lines necessary for [WeCare] to utilize the Site to perform its obligations under this Agreement.

Section 3.02 of the 1998 Agreement provides:

<u>Exclusive Use of Site</u>.  The Municipality hereby agrees that [WeCare] shall have the exclusive right to occupy and use the Site, with all buildings and structures thereon, for the Term of this Agreement for use solely for the Facility in accordance with the terms of this Agreement. All buildings; structures and equipment placed on the Site by [WeCare] shall be and remain the property of [WeCare]. The Municipality agrees that [WeCare]'s use of the Site is a "public purpose" within the meaning of Chapter 59, Section 2B of the General Laws of Massachusetts and that [WeCare] shall not be assessed or taxed for the real or personal property comprising the Site or the Facility.

Section 4.02 provides:  "<u>Hours of Delivery</u>.  [WeCare] shall keep the Facility open for the delivery of Acceptable Waste at the Facility during the Normal Delivery Hours."[2]

Section 4.06 provides, in part:  "<u>Compliance with Laws</u>.  [WeCare] shall operate and maintain the Facility in full compliance with all applicable laws, regulations and rules, including over control and noise levels, and in accordance with the Consent Decree."

Section 4.10(a) appears under the heading "Traffic Flow Regulation" and provides:

[WeCare] may reasonably regulate the flow of traffic into the Facility and may deny admission to the Site to any vehicle carrying Hazardous Waste or Unacceptable Waste, any vehicle that may unreasonably leak, spill or allow waste or Residue to be blown or scattered, and any vehicle that is not in a safe condition for purposes of its operation at the Facility, and may otherwise promulgate reasonable safety and traffic rules applicable to the Site.

Section 5.04(b) appears under the heading "Recycling Obligations" and provides:  "(b) [WeCare] shall design, permit, construct and operate the recycling and rubbish drop-off center that is part of the Facility in accordance with applicable laws and permits and the Consent Decree."

---

[2] Section 4.11 appears to copy the language of Section 4.02 exactly.  (Agreement § 4.11).

4

Section 5.07(b) appears under the heading "General Covenants with Respect to the Facility" and provides:

(b) <u>Leachate Control</u>. Stormwater or other water (including wash water) which comes in contact with solid waste being received, stored, processed or composted, or which mixes with leachate, will be considered leachate and will be reused in the process, treated to meet discharge standards, or discharged directly to the Municipality's Easterly Wastewater Treatment Facility if within the acceptable parameters for treatment at that facility. [WeCare] will be responsible for returning to the Municipality's wastewater treatment facility acceptable residual water to be treated by the Municipality. [WeCare] shall be responsible for the operation and maintenance of the entire leachate control system including pumping station and force main.

Section 7.04(a) appears under the heading "Electricity" and provides:

(a) During the Term, [WeCare] shall cause all electricity used by the Facility to be metered and shall timely pay all utility charges for such electricity; provided, however, that during the Term, the Municipality shall reimburse [WeCare] for one-third (1/3) of [WeCare]'s electric utility charges for the Facility. [WeCare] and the Municipality shall cooperate in good faith in selecting the supplier of electricity to the Facility.

Section 7.05 provides:

<u>Water</u>. (a) During the Term, [WeCare] shall cause all water used by the Facility to be metered and will timely pay all charges for such water; provided, however, that the Municipality will provide at its expense up to 3,000 gallons of potable water per day and up to 74,000 gallons of secondary water per day from the adjacent municipal water treatment facility for use in [WeCare]'s proceeding.

(b) [WeCare] will be responsible for pumping the water from the Municipality's treatment plant to the Facility and for returning residual water which shall be within acceptable parameters for treatment in the Municipality's treatment plant.

Section 9.02 provides:

<u>Monthly Tipping Fees</u>. Commencing on the Commencement Date of Operations and for each Monthly Billing Period thereafter, the Municipality shall pay [WeCare]

(i) the Monthly Facility Fee, plus

(ii) the greater of (a) or (b) below, less the total amount paid under

this clause (ii) of Section 9.02 (excluding Monthly Facility Fees) for all prior Monthly Billing Periods in the Billing Year:

(a) An amount equal to:

(i) the Waste Unit Billing Rate plus the Residue Unit Billing Rate, multiplied by the number of Tons of Acceptable Waste (excluding Unprocessed Waste and excluding sludge) accepted at the Facility from or for the account of the Municipality from the beginning of the Billing Year through the end of such Monthly Billing Period, plus

(ii) the Sludge Unit Billing Rate, multiplied by the number of Tons of Acceptable Sludge (including for, this purpose, only Acceptable Sludge) accepted at the Facility from or for the account of the Municipality from the beginning of the Billing Year through the end of such Monthly Billing Period, plus

(iii) the Waste Unit Billing Rate, multiplied by the number of Tons of Unprocessed Waste accepted at the Facility from or for the account of the Municipality from the beginning of the Billing Year through the end of such Monthly Billing Period.

(b) An amount equal to:

(i) the Monthly Base Fee, multiplied by the number of completed Monthly Billing Periods in the Billing Year, less

(ii) the number of Tons of Bypass Waste from the beginning of the Billing Year through the end of such Monthly Billing Period including, for purposes of this Subsection (b), Bypass Waste that [WeCare] rejected by reason of Uncontrollable Circumstances, multiplied by the applicable Unit Billing Rate.

Section 9.03(e) appears under the heading "Billing and Payments" and provides: "Any payments not made by either party when due shall bear interest until paid at the rate of one percent (1%) per month, except that either party may grant to the other a 15-day grace period for

6

reasons stipulated in writing."

Section 13.02 provides, in part:

The Municipality agrees that it shall protect, indemnify and hold harmless [WeCare], its affiliates, and their respective officers, employees, agents and invitees (the "Company Indemnified Parties"), from and against any and all costs and expenses (including, but not limited to, reasonable attorneys' fees and court costs incurred in any court or administrative proceedings or arbitration), claims and liabilities arising out of (i) the performance (or non-performance) of the Municipality's obligations under this Agreement.[3]

Section 14.01 provides: "Applicable Law and Venue. The law of the Commonwealth of Massachusetts shall govern the validity, interpretation, construction and performance hereof."

### 3. The Payment Dispute

As detailed above, the 1998 Agreement obligates the City to remit monthly payments to WeCare. (*See* 1998 Agreement § 9.02). WeCare sends monthly invoices to the City requesting payment for the services rendered in an individual month. (*See, e.g.*, Dkt. No. 117, Ex. B). Prior to the onset of this litigation, the City timely paid all amounts due under Section 9.02 of the 1998 Agreement. (McCarthy Aff. ¶ 5).

According to the affidavit of WeCare President Philip McCarthy, since the date on which the City initiated this action it has failed to make payments in full for services rendered in at least six months—April 2013, August 2013, February 2014, July 2014, August 2014, and September 2014. (*Id.*; Dkt. No. 117, Ex. A).

### 4. The Sewer Charge Dispute

Section 510-2.E of the City's sewer use ordinance provides that the Commissioner of the

---

[3] Section 13.01 states a similar obligation of Bedminster (WeCare's predecessor) to "indemnify, defend, and save and hold harmless" the City, but it is limited by its terms to expenses arising out of "claims and liabilities imposed upon or incurred by Municipality as a result of claims by third persons."

> shall annually establish equitable and just rental charges for the use of the sewerage facilities to be paid by every owner of an establishment whose building sewers connect directly or indirectly into public sewers. Such annual charges shall be in proportion to the quantity of water supplied to every such establishment, subject to any just equitable discounts and abatements in exceptional cases. The rental charges shall constitute a lien upon the real estate using such public sewers to be collected in the same manner as taxes upon real estate, or in an action of contract in the name of the City.

The term "public sewer" is defined by § 510-1 of the sewer use ordinance as "[a] sewer in which all owners of abutting properties have equal rights and which is controlled by public authority." The term "sewer" is defined in § 510-1 as "[a] pipe or conduit for carrying sewage."

From the time WeCare assumed the obligations under the Agreement in February 2003, until the initiation of this action by the City in December 2013, the City never charged WeCare for sewer use. (McCarthy Aff. ¶ 6; City Resp. to WeCare SMF ¶ 15; Assignment at 1). In December 2013, the City began to impose sewer charges on WeCare by subtracting "credits" from its monthly payments. (McCarthy Aff. ¶ 6; City Resp. to WeCare SMF ¶ 16). As of November 2014, the City had subtracted $97,781.04 in "sewer credits" from its payments to WeCare. (City SMF ¶ 23; Higgins Aff. ¶ 14).

In October 2014, the City issued an industrial pretreatment permit that expressly authorized WeCare to make certain discharges into the City's wastewater treatment facilities. (City SMF ¶ 20). Section II.a. of that permit provides, in part, that "[a]ll discharges authorized herein shall be consistent with the terms of this permit and the Code of the City of Marlborough Chapter 510, Sewers." (Permit at 1). Section IV.a. provides that "[i]n consideration of the wastewater disposal services provided by the City under the terms of this permit, the permittee shall pay a user charge at established rates." (Permit at 4).

### 5.    The Access Dispute

The WeCare facility shares a driveway with the City's Easterly Wastewater Treatment Plant and a commercial cell tower.  (City SMF ¶ 24).  That driveway is gated.  (*Id.*).  Prior to the summer of 2014, WeCare and its third-party haulers had keys to the gate and could thus obtain access the facility twenty-four hours per day, seven days per week.  (*Id.*).  In the summer of 2014, the City began to secure the gate with a different lock, to which only the City had the key. (*Id.*).  The City opens the gate each morning from Monday through Saturday  at 5:00 a.m., and it closes the gate at 6:30 p.m. Monday through Friday and at 4:30 p.m. on Saturdays.  (City SMF ¶ 26).  As a result, WeCare no longer has immediate, round-the-clock access to its facility. (McCarthy Aff. ¶ 7; City Resp. to WeCare SMF ¶ 20).[4]

In order to access the facility while the gate is locked, WeCare must contact an "on-call man" (an employee of the City) to request that the gate be unlocked.  (Ghiloni Aff. ¶ 7; McCarthy Aff. ¶ 7).  According to the City, the "on-call man responds to telephone calls from WeCare as quickly as he can."  (Ghiloni Aff. ¶ 7).

### B.    Procedural Background

The City initiated this action by filing a complaint in Middlesex Superior Court on November 6, 2013.  On November 13, 2013, WeCare removed the action to this Court.  On December 4, 2013, WeCare filed its answer and counterclaimed for breach of contract,

---

[4] According to the affidavit of John L. Ghiloni, Commissioner for the City of Marlborough's Department of Public Works, the City began locking the gate "because the [Easterly Wastewater Treatment Plant] serves the entire eastern portion of the city [and] is thus intended by the City to be a secure facility, and [because] the Massachusetts Department of Environmental Protection deems the [plant] to be critical infrastructure."  (Ghiloni Aff. ¶ 5). According to the affidavit of Michele Higgins, the City's Assistant Commissioner for Utilities, one threat to the plant's security that existed prior to the City's placing restrictions on the gate to the driveway was the frequent entry and exit of trucks to the WeCare Facility "at all hours of the night, well outside of WeCare's Normal Delivery Hours."  (Higgins Aff. ¶ 16).

indemnification, and breach of the implied covenant of good faith and fair dealing.  On January

16, 2015, WeCare filed this motion for partial summary judgment.

## II.     <u>Legal Standard</u>

The role of summary judgment is to "pierce the pleadings and to assess the proof in order

to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816,

822 (1st Cir. 1991) (internal quotation marks omitted).  Summary judgment is appropriate when

the moving party shows that "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Essentially, Rule 56[]

mandates the entry of summary judgment 'against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir.

1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making that

determination, the court must view "the record in the light most favorable to the nonmovant,

drawing reasonable inferences in his favor."  *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir.

2009).  When "a properly supported motion for summary judgment is made, the adverse party

'must set forth specific facts showing that there is a genuine issue for trial.'"  *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (footnotes omitted).  The non-moving party may

not simply "rest upon mere allegation or denials of his pleading," but instead must "present

affirmative evidence."  *Id*. at 256-57.

## III.    <u>Analysis</u>

WeCare seeks an order on three issues:  (1) the City's payment obligations under the

Agreement; (2) the City's right to charge WeCare for sewer use; and (3) WeCare's rights of

access to the facility under the Agreement. The Court will consider each in turn.

### A. The City's Payment Obligations

#### 1. Section 9.02

WeCare contends that the City has failed to meet its payment obligations under Section 9.02 of the Agreement on at least five occasions. Specifically, it contends that the City underpaid for services rendered in the months of August 2013, February 2014, July 2014, August 2014, and September 2014.[5] The City contends that it paid the proper amount for each of those months.

In its memorandum in opposition to WeCare's motion, the City appears to have justified its payment amounts for the months in question by reference only to the criteria set out in Section 9.02(a). The City's memorandum does not include a calculation of the payment amount under Section 9.02(b), and it does not state that the amount as calculated under Section 9.02(a) was greater than the amount as calculated under 9.02(b).

WeCare contends that the plain language of the 1998 Agreement dictates that the City must pay the greater of the 9.02(a) amount and the 9.02(b) amount and seeks an order confirming "that the City must make proper payments pursuant to Section 9.02(a) or 9.02(b), whichever is greater, for past payments and for payments going forward." (WeCare Reply at 12)..

Section 9.02 of the 1998 Agreement states that "the [City] shall pay [WeCare] (i) the Monthly Facility Fee, plus (ii) the greater of (a) or (b) below, less the total amount paid under this clause (ii) of Section 9.02 (excluding Monthly Facility Fees) for all prior Monthly Billing

---

[5] WeCare's memorandum in support of its motion also listed April 2013 as a month in dispute, but WeCare has since withdrawn its claim for that month's payment, without prejudice to its renewal.

Periods in the Billing Year."

The Court agrees with WeCare that the language quoted above unambiguously states that the City must pay the greater of the 9.02(a) amount and the 9.02(b) amount, less a certain other sum.[6] *See Seaco Ins. Co. v. Barbosa*, 435 Mass. 772, 779 (2002) ("If a contract . . . is unambiguous, its interpretation is a question of law that is appropriate for a judge to decide on summary judgment.").

However, to the extent WeCare seeks an award of damages on the basis of that interpretation, such a remedy would be inappropriate at this stage. There is a disputed issue of fact between the parties as to the proper amount owed, and the Court cannot grant summary judgment to a counterclaim-plaintiff under those circumstances. Accordingly, the motion for summary judgment will be denied to the extent that WeCare seeks full payment of its invoices at this time.

### 2. Interest and Attorneys' Fees

WeCare further requests that the Court order "that the City . . . must pay interest on amounts not timely paid plus WeCare's attorneys fees." (WeCare Reply at 12).

Section 9.03(e) of the 1998 Agreement states: "Any payments not made by either party when due shall bear interest until paid at the rate of one percent (1%) per month, except that either party may grant to the other a 15-day grace period for reasons stipulated in writing."

Section 13.02 states, in part:

> The Municipality agrees that it shall protect, indemnify and hold harmless [WeCare], its affiliates, and their respective officers, employees, agents and invitees (the "Company Indemnified Parties"), from and against any and all costs and expenses

---

[6] It is unclear whether the City disputes that interpretation of Section 9.02; at a minimum, it has not proffered any alternative interpretation.

(including, but not limited to, reasonable attorneys' fees and court costs incurred in any court or administrative proceedings or arbitration), claims and liabilities arising out of (i) the performance (or non-performance) of the Municipality's obligations under this Agreement.

The interpretation of Section 9.03(e) appears clear; if WeCare is correct that the City has not made certain payments in full by the time of their due date, then WeCare is entitled to one-percent interest on those payments.

The meaning of Section 13.02 is not as immediately obvious. Although the plain language of the section appears to encompass attorneys' fees arising out of claims brought by any party (including the City or WeCare), the City could make a plausible argument that indemnity clauses apply only to claims brought by third parties. Indeed, some jurisdictions have so held. *See, e.g.*, *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 198-200 (2d Cir.2003) (applying New York law and holding that indemnification provision only applied to third-party suits and thus did not authorize award of attorney fees between parties to the contract); *Canopy Corp. v. Symantec Corp.*, 395 F. Supp.2d 1103, 1115 (D. Utah 2005) (applying Utah law and holding that the use of the word "defend" in the indemnification provision indicated the parties' intent that the provision only apply to third-party claims).; *Estate of Pearson v. Interstate Power & Light Co.*, 700 N.W.2d 333, 344-45 (Iowa 2005) (holding that the use of the terms "indemnify" and "hold harmless" indicates an intent by the parties to refer only to claims brought by third parties).

However, the law of Massachusetts does not provide for such a strict construction of indemnification provisions.[7] "Massachusetts law . . . has not adopted a special rule that requires

---

[7] The choice-of-law provision in the Agreement (Section 14.01) clearly states that "[t]he law of the Commonwealth of Massachusetts shall govern the . . . interpretation" of the Agreement.

that indemnity contracts be read as only applying to third parties unless there is explicit language to the contrary." *Caldwell Tanks, Inc. v. Haley & Ward, Inc.*, 471 F.3d 210, 216 (1st Cir. 2006) (citing *Hill v. Cabot*, No. 91-0514-E, 1994 WL 878954, at *8 (Mass. Super. Ct. Oct. 27, 1994)). More generally, "the Supreme Judicial Court [has] rejected arguments that under Massachusetts law contracts of indemnity should be . . . strictly construed." *Id.* (citing *Shea v. Bay State Gas Co.*, 383 Mass. 218, 221-22 (1981)).

Thus, under Massachusetts law, a plain reading of Section 13.02 unambiguously yields the interpretation that the City must pay "reasonable attorneys' fees and court costs" arising out of "the performance (or non-performance) of the [C]ity's obligations under th[e] Agreement." That conclusion is bolstered by the language of Section 13.01, which specifically states that "[WeCare] shall indemnify . . . the [C]ity and its officers and employees against and from all costs and expenses . . . claims and liabilities imposed upon or incurred by [C]ity *as a result of claims by third persons* . . . ." (emphasis added). In other words, the 1998 Agreement expressly limits WeCare's duty to indemnify to circumstances in which a third party has brought suit; no such limitation appears in the description of the City's duty to indemnify.

Accordingly, WeCare will be entitled to interest on any amounts that it proves the City did not timely pay, as well as reasonable attorneys' fees if it proves that the City materially breached the Agreement. Again, however, the calculation of any such amount would be premature at this stage of the litigation.

### B. Sewer Charges

WeCare next contends that the City is not entitled under the 1998 Agreement to impose charges for sewer use. The parties agree that the City subtracted $97,781.04 in "sewer credits" from its payments to WeCare for services rendered in the months of December 2013 through

November 2014.  WeCare seeks that amount in damages, "plus interest on amounts not timely

paid plus WeCare's attorneys fees in respect of improperly taken sewer charges," along with an

order stating "that the City may no longer assess o[r] otherwise take credits for sewer charges."

(WeCare Reply at 12-13).

The word "sewer" does not appear anywhere in the text of the 1998 Agreement.

However, both parties agree that the 1998 Agreement appears to contemplate that the WeCare

facility would utilize a pipe or conduit in order to discharge liquid effluent, or leachate, to the

City's Easterly Wastewater Treatment Plant.  (*See* Agreement at 5.07(b) (Leachate Control),

7.05(b)).  WeCare contends that because the 1998 Agreement clearly contemplates sewer use, its

"silence on the City's ability to charge for sewer usage is damning."  (WeCare Mem. at 8).

WeCare further notes that the 1998 Agreement specifically sets out its duty to pay for

two other utilities—electricity and water.  Section 7.04(a) obligates WeCare to meter its

electricity and specifies that the City will reimburse WeCare for one-third of its electric utility

charges (but that WeCare is obligated to pay the balance).   Section 7.05(a) provides that the City

will provide WeCare with up to 3,000 gallons of potable water and up to 74,000 gallons of

secondary water at no charge, but that WeCare must meter its water usage and pay for the

balance beyond the quantity provided by the City.

The 1998 Agreement thus clearly contemplates an arrangement between WeCare and the

City in which the facility would utilize substantial City resources.  In the case of two other

utilities—electricity and water—the contract expressly provides specific payment terms.  The

lack of a parallel term for sewer usage strongly supports the inference that WeCare is not

obligated under the Agreement to pay for such usage.  *See Institut Pasteur v. Cambridge Biotech

Corp.*, 104 F.3d 489, 495 (1st Cir. 1997) (applying Massachusetts law and citing *Plumbers and*

*Steamfitters Local No. 150 Pension Fund v. Vertex Const. Co., Inc.*, 932 F.2d 1443, 1449 (11th Cir. 1991) for the proposition that "the doctrine of *expressio unius est exclusio alterius* instructs that when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded").

The only provision of the 1998 Agreement that might plausibly authorize the City to impose sewer charges is Section 4.06.  That section provides, in part:  "[WeCare] shall operate and maintain the Facility in full compliance with all applicable laws, regulations and rules, including odor control and noise levels, and in accordance with the Consent Decree."

The City contends that one such "applicable law[ or] regulation[]" is the City's Sewer Use Ordinance, which provides that the Commissioner of the City's Department of Public Works "shall annually establish equitable and just rental charges for the use of the sewerage facilities *to be paid by every owner of an establishment whose building sewers connect directly or indirectly into public sewers*."  (emphasis added).  According to the City, "[s]ince the WeCare facility connects directly with the [Easterly Wastewater Treatment Plant,] WeCare is the 'owner of an establishment whose building sewers connect directly or indirectly into public sewers'" and it thus must pay sewer-use fees under the ordinance.  (City Opp. at 14).

By its argument, the City appears to suggest that the sewer system through which WeCare connects to the Easterly Wastewater Treatment Plant is a "public sewer" under the Sewer Use Ordinance.  However, the term "public sewer" is defined in the ordinance as, among other things, "[a] sewer in which all owners of abutting properties have equal rights and which is controlled by public authority."  Marlborough, Mass., Sewer Use Ordinance § 510-1 (2007).  Here, the plain language of the Agreement makes clear that WeCare has distinct rights in the pipe or conduit connecting its facility to the Easterly Wastewater Treatment Plant; the City has

contracted with WeCare specifically to discharge effluent through that system. *See* Agreement § 5.07(b), 7.05(b). Although the City appears to dispute WeCare's contention that "no abutting properties have any rights to connect to WeCare's system" (*see* WeCare Reply at 7; City Sur-Reply at 3), the operative question under the Sewer Use Ordinance is not whether those properties have *any* rights, but whether they have *equal* rights to those of WeCare. The record, and common sense, make clear that they do not.[8]

The City also cites to the industrial pretreatment permit issued by the City to WeCare on October 24, 2014, as further support. That permit states, in Section II.a.: "All discharges authorized herein shall be consistent with the terms of this permit and the Code of the City of Marlborough Chapter 510, Sewers." (Permit at 1). It further states, at Section IV.a.: "In consideration of the wastewater disposal services provided by the City under the terms of this permit, the permittee shall pay a user charge at established rates."

The language of the permit is unavailing to the City for at least three reasons. First, the City began charging WeCare for sewer usage in December 2013, but the permit was signed in October 2014. At a minimum, then, the permit would not appear to justify the City's imposing sewer-use charges for the ten months from December 2013 through September 2014. Second, the statement that all discharges authorized by the permit "shall be consistent with . . . the [Sewer Use Ordinance]" simply begs the question; if WeCare is not otherwise subject to the provisions of the Sewer Use Ordinance, then discharging wastewater pursuant to the permit without paying sewer fees would not be inconsistent with the ordinance. Third, and similarly, the statement

---

[8] The City's sur-reply does not expressly dispute WeCare's contention that it alone connects to the pipe between its facility and the Easterly Wastewater Treatment Plant; instead, it simply notes that WeCare's reply brief did not cite to record authority for the proposition.

about "established rates" is a reference to past practice; if the parties have previously "established" that WeCare need not pay for its wastewater discharge, then the quoted language does not appear to alter that arrangement.

In sum, neither the Sewer Use Ordinance nor the industrial pretreatment permit provides a basis for the City's imposing charges for sewer use on WeCare. Moreover, as detailed above, the 1998 Agreement itself does not appear to contemplate sewer-use charges.

Finally, to the extent the 1998 Agreement is ambiguous as to whether contract was intended to subject WeCare to sewer-use charges, the parties' course of dealing since WeCare assumed the contract evinces a clear picture of that intent. Both parties agree that the City did not charge WeCare for its sewer use for more than ten years—from the date it took over the contract (February 25, 2003) through the date on which the City initiated this litigation (November 6, 2013). Indeed, the first month for which the City imposed a sewer-use charge was December 2013, the month after the litigation was filed. The City's failure to impose charges for sewer use for more than a decade is extremely persuasive evidence that the contracting parties never intended that the City would be able to assess such charges under the Agreement. *See Massachusetts Mun. Wholesale Elec. Co. v. Danvers*, 411 Mass. 39, 59 (1991) ("The conduct of the parties after the signing of the agreements is also indicative of their intent."); *Pittsfield & N.A.R. Corp. v. Boston & A.R. Co.*, 260 Mass. 390, 398 (1927) ("There is no surer way to find out what parties meant, than to see what they have done." (quoting *Brooklyn Life Ins. Co. v. Dutcher*, 95 U.S. 269, 273 (1890))).

For those reasons, the Court agrees with WeCare that the 1998 Agreement does not authorize the City to impose charges for WeCare's sewer usage. However, because the amount of sewer-usage fees charged to WeCare has presumably continued to accrue since November

2014 (the last month for which WeCare has asked the Court to reimburse its sewer charges), and because the litigation is ongoing, the Court will not calculate a damages award based on the imposition sewer fees at this time.

### C. Access Restrictions

Finally, WeCare seeks relief from what it contends are the unauthorized access restrictions placed by the City on the WeCare facility. Both parties agree that in the summer of 2014, the City began to restrict access to the only driveway that leads to the WeCare facility during certain times of the day. Specifically, the City began to lock the gate overnight and open it at 5:00 a.m. Monday through Saturday, locking it again at 6:30 p.m. Monday through Friday and at 4:30 p.m. on Saturday. Outside of those times, WeCare officials are only able to access or exit the facility by contacting a city employee who, both parties agree, responds with at least some delay.[9]

Section 3.02 of the 1998 Agreement provides, in part: "The [C]ity hereby agrees that [WeCare] shall have the exclusive right to occupy and use the Site, with all buildings and structures thereon." The term "Site" is defined in Section 1.01 as "that parcel of real property located in the [C]ity adjacent to the [C]ity's Easterly Wastewater Treatment Facility on which the Facility is to be constructed, . . ., together with licenses and rights of way for purposes of ingress, egress and utility lines necessary for [WeCare] to utilize the Site to perform its obligations under this Agreement."[10]

The plain language of Section 3.02 would appear to afford WeCare, at a minimum, a

---

[9] The extent of the delays in opening the gate appears to be disputed; the Court will construe the facts in the light of the nonmoving party and assume, for the purposes of this motion, that the on-call man responds to calls "as quickly as he can." (Ghiloni Aff. at 7).

[10] The full definition of "Site" appears in the Factual Background section above.

presumptive right to immediate access to its facility.  Moreover, nothing in the 1998 Agreement explicitly states that the City may restrict that access.  In lieu of citing such a provision, the City makes three contentions:  first, that the extra security is necessary to protect the City's Easterly Wastewater Treatment Plant, which shares a driveway with the WeCare facility; second, that WeCare has no right to access its facility outside of its "Normal Delivery Hours"; and third, that the Agreement grants WeCare only a revocable license to access and exit its facility.

The City's first contention is that the driveway leading to the WeCare facility must be locked at certain times of the day in order to ensure the security of its Easterly Wastewater Treatment Plant.  In support of that contention, it points to the affidavit of John L. Ghiloni, the Commissioner of the City's Department of Public Works.  Ghiloni stated in his affidavit that because the plant "serves the entire eastern portion of the City," it is "intended by the City to be a secure facility, and the Massachusetts Department of Environmental Protection deems [it] to be critical infrastructure."  (Ghiloni Aff. ¶ 5).  The City further contends that the security of the plant was threatened by, among other things, the fact that "[b]efore the City placed restrictions on the gate to the driveway, trucks entered and exited the WeCare Facility at all hours of the night, well outside of WeCare's Normal Delivery Hours."  (Higgins Aff. ¶ 16).

Even accepting the above factual assertions as true, they do not bear on WeCare's rights under the Agreement.  Either the Agreement provides WeCare with immediate, round-the-clock access to its facility or it does not; the questions of whether the Easterly Wastewater Treatment Plant merits extra security, or whether the frequent traffic of trucks posed a security risk to the plant, are separate inquiries.  If the City has a legitimate need to guard the plant, it must do so

through some other means than by interfering with the contractual rights of WeCare.[11]

Second, the City contends that the hours during which WeCare can obtain access to its facility (5:00 a.m. to 6:30 p.m. from Monday through Friday, and 5:00 a.m. to 4:30 p.m. on Saturday) are sufficient under the Agreement because they exceed WeCare's "Normal Delivery Hours" as specified in Section 1.01 of the Agreement and as amended in Section 4(a) of the Assignment and Amendment Agreement. Those hours, as amended, are 7:00 a.m. to 6:00 p.m. from Monday through Friday, and 8:00 a.m. to 3:00 p.m. on Saturday. (*See* 1998 Agreement § 1.01 ("Normal Delivery Hours"); Assignment § 4(a)). Thus, the "Normal Delivery Hours" span 62 hours per week (eleven per weekday, plus seven on Saturday) and the gate is unlocked for 79 hours per week (thirteen and a half hours per weekday, plus eleven and a half hours on Saturday).

In its opposition, the City states that "[i]t is unclear why WeCare's [m]otion would complain about an extra 21 hours per week above and beyond the contractual time period during which WeCare is supposed to have Normal Delivery Hours." (City Opp. at 17). Notwithstanding the mathematical error,[12] the City's contention relies on the underlying premise that WeCare is entitled to access its facility only during the defined "Normal Delivery Hours." But WeCare's "Delivery Hours," as specified in the Agreement, are in the nature of an obligation, not a right—the contract defines "Delivery Hours" as "the hours during which waste and sludge *shall be accepted* at the Facility." (Agreement § 1.01 (emphasis added)). Indeed, no

---

[11] The only reference in the 1998 Agreement to regulating or restricting traffic into the solid waste facility is contained in Section 4.10, which grants *WeCare*, not the City, the right to "reasonably regulate the flow of traffic into the Facility."

[12] Subtracting sixty-two from seventy-nine yields a result of only seventeen extra hours per week, not twenty-one.

provision of the Agreement limits WeCare's right to occupy, use, or access the facility based on the "Normal Delivery Hours"—or any other specified set of hours, for that matter.

Finally, the City contends that the only right of access or egress granted to WeCare by the Agreement is a license, revocable by the City at any time. The City's position with respect to this contention is grounded in the text of the Agreement; Section 1.01 defines "Site" as the relevant "parcel of real property . . ., together with *licenses and rights of way* for purposes of ingress, egress and utility lines necessary for [WeCare] to utilize the Site to perform its obligations under this Agreement." (emphasis added). Moreover, the City is correct that under Massachusetts law, a license typically is revocable "at the will of the owner of the property on which it is exercised," *Gray v. Handy*, 349 Mass. 438, 442 (1965), even where the licensee has made improvements upon the licensed land. *Home Inv. Co. v. Iovieno*, 243 Mass. 121, 125 (1922).

The above analysis, however, only accounts for part of the quoted text. Although a license is generally revocable by the licensor, a "right of way," when granted in an instrument, is generally considered to constitute an irrevocable easement. *See, e.g.*, *Cater v. Bednarek*, 462 Mass. 523, 524 (2012) (describing a deed that provided a "right of way" as granting "an unspecified easement"); *E. Whitehead, Inc. v. Gallo*, 357 Mass. 215, 216-17 (1970) (describing a deed that conveyed parcels of land "together with a right of way" over certain roads as having created an easement); *Mason v. Albert*, 243 Mass. 433, 437 (1923) ("It is plain an oral agreement to permit, whenever requested, a passage over land of the promisor to land of the promisee creates no enforceable interest in the land; and is at most a revocable license to use and enjoy a privilege, defined and limited in the terms of the agreement. Such an agreement contained in a deed would amount to an easement."). Thus, even taking the City's logic on its terms, it does

not demonstrate that WeCare's access to its facility may be limited under the Agreement.

The parties dispute many of the facts surrounding the *effect* of the access restrictions, but at this stage none of those disputes is necessary to resolve.[13] It is enough to note that WeCare has at least some legitimate reasons to seek immediate, round-the-clock access to its facility. Whether to address emergency situations, inspect damaged buildings, fix aging equipment, or just generally service the company, WeCare—like any business—will occasionally require access to its facility during off-hours. It has contracted for exclusive use and occupancy of that facility, and it did not contract for any restrictions to immediate, round-the-clock access to that facility. For those reasons, it is entitled to that access.

Accordingly, the motion for summary judgment will be granted in part with respect to the City's restricting WeCare's access to its facility.[14]

## IV.  Conclusion

For the reasons set forth above, WeCare's motion for partial summary judgment is GRANTED in part and DENIED in part. The Court makes the following rulings based on the undisputed evidence in the record:

1.  Section 9.02 of the 1998 Agreement requires the City each month to pay a monthly facility fee, plus the larger of the amount calculated under sub-section (a) and the amount calculated under sub-section (b), less the total amount paid for all prior months in the billing year (excluding monthly facility fees).

---

[13] For example, WeCare contends that the access restrictions create safety hazards and prevent it from "attending to all of its business and operational needs."  (WeCare Mem. at 10).

[14] Because WeCare has not moved for a preliminary injunction, and because it would be premature to enter a permanent injunction at this stage, the Court will not now order the City to immediately provide WeCare with the access to its facility to which it is entitled under the 1998 Agreement.  If WeCare later moves for an injunction, the Court will consider that motion in light of its ruling today.

2. Section 9.03(e) of the 1998 Agreement requires the City to pay interest at the rate of one percent per month on any late payments, unless WeCare grants a 15-day grace period for reasons stipulated in writing.

3. Section 13.02 of the 1998 Agreement requires the City to pay reasonable attorneys' fees and court costs incurred by WeCare if WeCare successfully demonstrates that the City has failed to meet a payment obligation under the 1998 Agreement.

4. Neither the 1998 Agreement, nor the City's Sewer Use Ordinance, authorizes the City to impose charges for sewer use on WeCare.

5. The 1998 Agreement entitles WeCare to immediate, round-the-clock access to its facility.

The Court does not, however, reach the issue of the appropriate legal or equitable remedy at this stage of the proceedings.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV

Dated:  June 5, 2015                                        United States District Judge